07 CV 6709

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : |
| Plaintiff, | : : |
| v. | Civ. No. _____ |
|  | : : ECF CASE |
| CARDINAL HEALTH, INC., | : |
| Defendant. | : : |

---

JUL 6 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission"),

alleges for its Complaint as follows:

### SUMMARY

1.     From at least September 2000 through at least March 2004, defendant Cardinal

Health, Inc. ("Cardinal" or the "Company") engaged in a fraudulent earnings and revenue

management scheme and other improper accounting and disclosure practices.  Cardinal engaged

in this conduct in order to present a false picture of its results of operations to the financial

community and the investing public – one that matched Cardinal's publicly disseminated

earnings guidance and analysts' expectations, rather than its true economic performance.

Through these practices, the Company materially overstated its operating revenue, earnings and

growth trends in certain earnings releases and filings with the Commission.

2.     Cardinal, through the conduct of members of its corporate management, managed

its reported revenue and earnings by:  (a) inflating reported operating revenue by misclassifying

over $5 billion of bulk inventory sales as operating revenue; (b) selectively accelerating, without

disclosure, the payment of vendor invoices in order to prematurely record a cumulative total of $133 million in cash discount income; (c) improperly establishing a general reserve  account and improperly adjusting reserve accounts, which misstated earnings by over $65 million; and (d) improperly classifying $22 million of expected litigation settlement proceeds to increase operating earnings.  In addition, on one occasion, Cardinal intentionally transferred inventory within business units in order to avoid a negative impact on year-end reported earnings due to the application of its last-in-first-out ("LIFO") method of inventory valuation.  Further, the Company failed timely to disclose the impact of a change in the method of applying its LIFO accounting principle.  Cardinal also prematurely recognized millions of dollars in revenue from Pyxis ("Pyxis"), a wholly-owned subsidiary the Company featured as an important growth driver.

3.    Due to the practices described above, between its fiscal years ("FY") 2001 and 2004, Cardinal misrepresented its trends in reported operating revenue and earnings.  During this period, Cardinal's public claims of 16 consecutive years of 20% or higher growth in earnings per share before special items ("EPS"), and 77 consecutive quarters in which it "met or beat guidance," were untrue.  In addition, the Company's 15 earnings releases and earnings conference calls, its 15 periodic reports and more than 10 registration statements filed with the Commission during this period contained materially false and misleading statements and omissions of material information.

4.    When engaging in the practices described above, Cardinal circumvented internal accounting controls.  Cardinal also failed to maintain a system of internal accounting controls sufficient to prevent material misstatements in its books, records, accounts and financial statements and to provide reasonable assurances that the Company's financial statements were prepared in conformity with Generally Accepted Accounting Principles ("GAAP").  As a result,

Cardinal's books, records and accounts did not fairly and accurately reflect the Company's transactions.

5.    During the course of the Commission's investigation of this matter, Cardinal's Audit Committee conducted an internal investigation. On October 26, 2004, based on the findings of its Audit Committee's investigation, Cardinal restated its financial results for its FYs 2000 to 2003 and for the first three quarters of FY 2004. In its restatement, Cardinal disclosed that it had improperly classified approximately $1.2 billion of bulk revenue as operating revenue, that the Company had an undisclosed practice of accelerating payment of vendor invoices at the end of certain reporting periods, which improved operating results for those periods, and that certain non-recurring expenses in FY 2002 were partially offset by a $23 million benefit during the period resulting from changes in Cardinal's LIFO calculation for generic products. The restatement also reduced the Company's net earnings by a cumulative total of $65.2 million, due to the Company's adjustments to reserves and other accruals, which were restated as a result of misapplications of GAAP, other errors or an absence of substantiation. In addition, the Company reversed, reclassified and recognized in a later period $22 million of expected litigation settlement proceeds it had previously recognized during the second quarter of FY 2001 and the first quarter of FY 2002, and reduced its FY 2003 operating earnings by $5.3 million to correct the intentional avoidance of a LIFO charge resulting from the Company's improper transfer of inventory between business units. The Company also disclosed, for the first time, that it had prematurely recognized an indeterminable amount of Pyxis revenue and that a material weakness existed in Cardinal's internal controls, based in part on the inappropriate application of Cardinal's bulk revenue classification policy during several quarters of FY 2002 and 2003.

6.    By engaging in the conduct described above, Cardinal violated the antifraud, reporting, books and records, and internal controls provisions of the federal securities laws. Through this action, the Commission requests that the Court, among other things:  (1) permanently enjoin defendant Cardinal from further violations of the federal securities laws; (2) order defendant Cardinal to disgorge certain gains from its conduct violating the federal securities laws; and (3) order defendant Cardinal to pay a civil monetary penalty.

## JURISDICTION AND VENUE

7.    The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

8.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].  The defendant, directly and indirectly, used the means or instrumentalities of transportation, interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and course of business alleged in this Complaint.

9.    Certain of the acts, practices and courses of conduct constituting the violations of law alleged in this Complaint occurred within this judicial district and, therefore, venue is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Cardinal, directly and indirectly, has engaged in, and unless restrained and enjoined by this Court will continue to engage in, transactions, acts, practices and courses of business that violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a),

78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11 and

13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

## DEFENDANT

10.    Cardinal, a Fortune 20 company, is an Ohio corporation with headquarters in

Dublin, Ohio. Cardinal's common stock is registered with the Commission pursuant to Section

12(b) of the Exchange Act, and trades on the New York Stock Exchange. At all times relevant to

this Complaint, Cardinal was a diversified provider of products and services in the health care

industry, and its businesses were classified into four reporting segments: Pharmaceutical

Distribution and Provider Services ("Pharmaceutical Distribution"), Pharmaceutical

Technologies and Services ("Pharmaceutical Technologies"), Medical Products and Services and

Automation and Information Services, which included Pyxis. Cardinal's fiscal year ends on June

30. For FY 2001 through 2004, Cardinal reported total revenues of $47 billion, $51 billion, $56

billion, and $65 billion, respectively.

## I.    CARDINAL CLOSELY MONITORED SEGMENT AND CONSOLIDATED PERFORMANCE

11.    Cardinal carried out  its earnings and revenue management scheme and other

improper accounting and disclosure practices within the context of a detailed budgeting,

forecasting and internal reporting process for operating earnings, revenue and net income.

Cardinal's corporate management pushed the business segments to achieve higher earnings

growth by setting aggressive financial targets, and a segment's earnings was a main factor

Cardinal used in determining management's bonuses. Throughout the fiscal year, Cardinal's

corporate management closely monitored the Company's segment and consolidated financial

performance, to assess whether it was in line with internal expectations and the external guidance

from Cardinal on which analysts based their projections. Cardinal's goal was to meet or exceed

its revenue and earnings guidance, including year-over-year quarterly EPS growth of 20% or more.

12.      As a result of this detailed and continuous monitoring, Cardinal's corporate management knew when the monthly forecast for a business unit or segment was less than its budgeted expectations. Cardinal referred to this as a "gap." When it identified gaps, the Company identified or developed "initiatives" (*i.e.,* actions to take to improve financial performance) to close the gaps in order to meet analysts' expectations. A number of these initiatives involved fraudulent and improper accounting or disclosure practices.

## II.      CARDINAL'S FRAUDULENT AND OTHER IMPROPER ACCOUNTING AND DISCLOSURE PRACTICES

### A.      Cardinal Misclassified over $5 Billion of Bulk Sales as Operating Revenue

#### 1.      Cardinal Historically Treated Low-Margin Bulk Sales From Pharmaceutical Distribution as Bulk Revenue

13.      At all relevant times, Pharmaceutical Distribution was Cardinal's largest segment, generally representing over 80% of the Company's consolidated total revenue and over 40% of its consolidated total gross profits. Pharmaceutical Distribution divided its business during the relevant period between "direct store door" business and the "Brokerage" business.

14.      During the relevant period, Pharmaceutical Distribution's basic business was buying pharmaceutical products in full case quantities (bulk) and breaking them down to customized orders and delivering them to pharmacies and other provider customers. Cardinal classified revenues from this direct store door business as operating revenue. During the relevant period, direct store door business generally consisted of sales by Cardinal directly to customers out of inventory Cardinal held at its warehouses. Cardinal historically profited from price

increases that occurred between the time it bought the inventory from manufacturers and the time it sold the inventory to customers. This was a "buy-and-hold" profit model.

15.    The Brokerage business consisted of sales of bulk product to customer warehouses. Certain bulk sales went directly from the manufacturer to Cardinal's customer. Cardinal also ordered bulk product from the manufacturer for its customer, received the product on a Cardinal loading dock, and then shipped it to the customer, usually within 24 hours. During the period relevant to this Complaint, these two types of bulk sales had virtually no profit margin and minimal holding and handling costs to Cardinal. Cardinal's compensation for these bulk sales primarily consisted of interest earned on cash between the time Cardinal received payment from the customer until the time that Cardinal made payment to the manufacturer.

16.    During the relevant time period, Cardinal reported its revenue, along with the associated cost of sales, as two separate line items, one being operating revenue and the other being bulk sales to customer warehouses ("bulk revenue"). Historically, bulk revenue included sales of bulk product, as described above.

17.    As Cardinal's corporate management understood, investors and analysts focused on Cardinal's operating revenue, rather than its bulk revenue, to evaluate the Company's financial performance. Therefore, Cardinal sought to report high operating revenue and high operating revenue growth rates, as compared to prior quarters and fiscal years. By highlighting operating revenue, Cardinal made clear to investors and analysts that operating revenue, for both the Company and for Pharmaceutical Distribution, was a key measure of the Company's performance.

18.    From September 1998 through June 2001, Cardinal consistently reported operating revenue growth rates, as compared to the year-ago quarter or fiscal year, of 15% or higher for the

Company and 20% or higher for Pharmaceutical Distribution. During this period, Cardinal also reported quarterly and annual EPS growth of 20% or higher, as compared to the year-ago quarter or fiscal year.

19.    In the Fall of 2001, Cardinal and Pharmaceutical Distribution began to experience downward pressure on their operating revenue, operating revenue growth rates and earnings.

20.    Beginning in the quarter ended December 31, 2001, Cardinal responded to the pressure on its operating revenue by misclassifying billions of dollars of almost zero profit margin bulk sales as operating revenue. Cardinal implemented three initiatives, which it did not disclose, to inflate its faltering operating revenue and operating revenue growth, even though the initiatives also materially reduced its operating gross margins as a percentage of operating revenue.

### 2. Cardinal Implements an Undisclosed "24-Hour Rule" Initiative to Reclassify Certain Bulk Sales

21.    In November 2001, Cardinal created and began to follow an undisclosed internal practice whereby it classified revenue from the sale of bulk product as operating revenue, provided the bulk product was in its possession for more than 24 hours prior to being shipped ("the 24-Hour Rule"). Cardinal created the 24-Hour Rule for the purpose of inflating reported operating revenue and operating revenue growth rates, which were slowing at the time. This initiative did not create any new revenue, but, instead, shifted revenue from the bulk revenue line to the operating revenue line.

22.    Unbeknownst to investors and analysts, the 24-Hour Rule overstated Cardinal's reported operating revenue for 10 consecutive quarters, from the quarter ended December 31, 2001, through the quarter ended March 31, 2004, and overstated Cardinal's reported operating revenue growth rates for six out of eight quarters during FY 2002 and 2003. During this time

period, the 24-Hour Rule overstated Cardinal's reported operating revenue by approximately $2 billion ($466 million during FY 2002, $1 billion during FY 2003 and $526 million during the first three quarters of FY 2004).

### 3.    Cardinal Uses the "24-Hour Lever" Initiative To Further Inflate Reported Operating Revenue

23.    Soon after implementing the 24-Hour Rule initiative, Cardinal began to implement another initiative to inflate its operating revenue results.  During the quarter ended December 31, 2001, the Company began intentionally holding certain bulk inventory orders on Cardinal's premises for longer than 24 hours (instead of shipping them in less than 24 hours as would otherwise have occurred) solely to convert the sale of this product from bulk revenue to operating revenue (the "24-Hour Lever").  Cardinal used the 24-Hour Lever to shift revenue from the bulk revenue line to the operating revenue line for the purpose of fraudulently inflating reported operating revenue and operating revenue growth rates.  Cardinal did not disclose its use of the 24-Hour Lever.

24.    Members of Cardinal's corporate management decided when to start and stop the 24-Hour Lever, basing such decisions on the strength or weakness of quarterly sales, in comparison to the Company's operating revenue and operating revenue growth rate targets.  As a result, Cardinal did not apply the 24-Hour Lever in every quarter, and did not use it throughout an entire quarter when it was applied.  For instance, in a February 19, 2003 e-mail, a then member of Cardinal's corporate management asked a Pharmaceutical Distribution employee what was the "latest date" that Cardinal could "turn on the 24hr. sales lever and achieve a meaningful benefit for [the] quarter."  Cardinal's use of the 24-Hour Lever also depended, in part, on how strong or weak the Company's quarterly earnings were, since Cardinal was concerned that it would appear anomalous to analysts and investors if Cardinal reported strong

operating revenue alongside weak operating earnings. Cardinal used the 24-Hour Lever to achieve a certain operating revenue result, as evidenced in a March 15, 2003 e-mail in which a then member of corporate management noted the decision to turn on the 24-Hour Lever "for the remainder of March, in order to achieve 10% growth in the segment...", and indicated that members of corporate management were "monitoring it on a daily basis."

25.    Unbeknownst to investors and analysts, the 24-Hour Lever fraudulently overstated Cardinal's reported operating revenue and operating revenue growth rates during two quarters of FY 2002 and two quarters of FY 2003. During these four quarters, the 24-Hour Lever overstated the Company's reported operating revenue of approximately $48.5 billion by $1.2 billion ($414 million during the two relevant quarters of FY 2002 and $813 million during the two relevant quarters of FY 2003). In particular, during the quarter ended December 31, 2002, Cardinal improperly classified $673 million of bulk sales as operating revenue through the use of the 24-Hour Lever. This represented 5.30% of Cardinal's total reported operating revenue for the quarter and 6.39% of Pharmaceutical Distribution's total reported operating revenue for the quarter.

### 4.    Cardinal's Undisclosed "Just-in-Time" Initiative Converts Bulk Revenue to Operating Revenue

26.    Beginning in the quarter ended March 31, 2002, Cardinal implemented a third initiative, called "Just-in-Time" ("JIT"), that artificially converted bulk revenue to operating revenue. Under JIT, Cardinal, based on past customer buying trends, placed orders for bulk product in advance of anticipated customer orders. Cardinal then received the bulk product into its inventory and held the product until a customer placed an order. In this way, Cardinal could hold bulk product for longer than 24 hours and convert the sales to operating revenue. Cardinal

did not disclose this practice to the public and did not inform its customers of the program during its implementation.

27.    JIT shifted revenue from the bulk revenue line to the operating revenue line and was used to inflate Cardinal's reported operating revenue and operating revenue growth rates.

28.    Unbeknownst to investors and analysts, JIT overstated Cardinal's reported operating revenue for nine consecutive quarters, from the quarter ended March 31, 2002, through the quarter ended March 31, 2004, and overstated Cardinal's reported operating revenue growth rates for four out of eight quarters during FY 2002 and 2003. During this time period, JIT overstated the Company's reported operating revenue by approximately $1.8 billion ($482 million during the last two quarters of FY 2002, $1.2 billion during FY 2003 and $118 million during the first three quarters of FY 2004).

### 5.    The Material Impact of the 24-Hour Rule, 24-Hour Lever and JIT Initiatives on Cardinal's Reported Operating Revenue

29.    From the quarter ended December 31, 2001, through the quarter ended March 31, 2004, the three operating revenue initiatives combined inflated the portion of Cardinal's revenues that were classified as operating revenue by over $5 billion: $1.4 billion in FY 2002 (3.07% of total reported operating revenue), $3 billion in FY 2003 (5.97% of total reported operating revenue), and $644 million in the first three quarters of FY 2004 (1.53% of total reported operating revenue). On a quarterly basis, the combined overstatement of reported operating revenue on a consolidated basis ranged from 1.22% to 8.96% during this period. On a segment basis, the three initiatives overstated Pharmaceutical Distribution's reported operating revenue by approximately 3.75% in FY 2002, 7.32% in FY 2003, and 1.89% in the first three quarters of FY 2004. On a quarterly basis, the combined overstatement of Pharmaceutical Distribution's reported operating revenue ranged from 1.50% to 10.80% during this period.

11

30.    Cardinal's use of the three initiatives peaked during the quarter ended December 31, 2002, and their impact was dramatic. In that quarter, Cardinal misclassified approximately $1.1 billion of bulk sales as operating revenue as a result of the three initiatives. This represented 8.96% of Cardinal's total reported operating revenue and 10.80% of Pharmaceutical Distribution's reported operating revenue.

31.    The combined impact of the three initiatives overstated Cardinal's reported operating revenue growth rates, as compared to the prior year. As a result, the Company misleadingly portrayed its trend in reported operating revenue growth. For example, without the initiatives, Cardinal's FY 2002 operating revenue growth would have been 11.31%, instead of the 14.83% Cardinal reported, representing a 31.12% overstatement of consolidated operating revenue growth. Similarly in FY 2003, Cardinal's operating revenue growth would have been only 10.27%, instead of the 13.68% Cardinal reported, representing a 33.20% overstatement of consolidated operating revenue growth. On a quarterly basis during FY 2002 and 2003, the consolidated growth rate was overstated through the three initiatives between 16.73% and 148.68%. The impact of the three initiatives on Pharmaceutical Distribution's reported operating revenue growth rates was even greater. Without the initiatives, Pharmaceutical Distribution's FY 2002 operating revenue growth would have been 12.22%, instead of the 16.59% Cardinal reported, representing a 35.76% overstatement. In FY 2003, Pharmaceutical Distribution's operating revenue growth without the initiatives would have been only 9.44%, instead of the 13.65% Cardinal reported, representing a 44.60% overstatement. On a quarterly basis during FY 2002 and 2003, the three initiatives overstated Pharmaceutical Distribution's operating revenue growth rate between 18.66% and 203.81%. Finally, the 24-Hour Rule, 24-Hour Lever and JIT

initiatives reduced Cardinal's and Pharmaceutical Distribution's reported gross margin as a percentage of operating revenue.

> **6.    Cardinal Issued Public Earnings Releases and
> Filed Reports with the Commission that were
> Materially False and Misleading Due to the Company's
> Use of the Operating Revenue Initiatives**

32.    Cardinal never disclosed its use of the 24-Hour Rule, 24-Hour Lever and JIT initiatives or their impact on the Company's reported revenue results until the Company announced its impending restatement in a Form 8-K filed with the Commission on September 13, 2004.

33.    Through these three initiatives, Cardinal materially misstated its operating revenue, operating revenue growth and/or gross margin rates in earnings releases and periodic filings with the Commission for 10 consecutive quarters, from the quarter ended December 31, 2001, through the quarter ended March 31, 2004.

34.    Cardinal also made materially false and misleading statements about bulk revenue in all of its periodic filings with the Commission from the quarter ended December 31, 2001, through the quarter ended March 30, 2004.  In the Management's Discussion and Analysis of Results of Operations and Financial Condition ("MD&A") section of each filing, Cardinal stated that "[f]luctuations in bulk deliveries result largely from circumstances that the Company cannot control." This statement was materially false and misleading because Cardinal was causing billions of dollars of such fluctuations through its movement of non-operating bulk revenue into operating revenue.

35.    In its earnings releases and periodic filings between the quarter ended December 31, 2001 and the quarter ended June 30, 2003, Cardinal made additional materially misleading statements when discussing year-over-year increases in reported operating revenue and operating

revenue growth rates. Cardinal variously attributed such increases, both for the Company and

Pharmaceutical Distribution, to, among other things, higher sales volume, pharmaceutical price

increases, acquisitions and new customers and products. These statements were materially

misleading because Cardinal never disclosed that over $4 billion of such reported operating

revenue and operating revenue growth during FY 2002 and FY 2003 resulted from the three

revenue initiatives.

**7.    Cardinal's Materially False and Misleading
        Statements in the December 16, 2003 Form 8-K**

36.    In September 2003, Pharmaceutical Distribution employees voiced concerns to

members of Cardinal's corporate management about the propriety of the 24-Hour Lever, and

thereafter, the Company decided to stop using the initiative. Moreover, by this time, the

Company also had decided to gradually stop JIT. After it ceased, or decreased, its use of these

initiatives, Cardinal was faced with declines in reported operating revenue growth rates, as

compared to the year-ago quarters in which the Company's operating revenue had been

substantially inflated through the 24-Hour Lever and JIT.

37.    On December 16, 2003, Cardinal distributed an investor newsletter, and also filed

with the Commission a Form 8-K which included the newsletter as an exhibit (collectively, the

"Newsletter"). The Newsletter included a prospective discussion of business model changes that

were in process within the pharmaceutical distribution industry. The Newsletter also included

historical information regarding the composition of Cardinal's pharmaceutical distribution

revenues.

38.    In the Newsletter, Cardinal ascribed the expected declines in reported operating

revenue growth to changes in its business model and the pharmaceutical distribution industry.

These statements were materially false and misleading because Cardinal failed to disclose that

14

the Company's decision to stop the 24-Hour Lever and sharply decrease its use of JIT would also cause significant declines in reported year-over-year operating revenue growth.

39.    The Newsletter also stated that future operating revenue growth would be impacted negatively by a significant decline in "bulk from stock" revenues, which the Company described as bulk orders sold from inventory and thus accounted for as operating revenue. Cardinal stated that it would be holding less bulk inventory under the new business model. As a result, fewer bulk orders would be filled from inventory, resulting in lower operating revenues.

40.    Cardinal then indicated that roughly $5.6 billion – or 14.35% – of its total reported operating revenue of $39 billion for FY 2003 was comprised of bulk from stock revenue. This statement was materially false and misleading, because Cardinal failed to disclose that more than half of the $5.6 billion in "bulk from stock" sales was simply bulk revenue that Cardinal had converted to operating revenue through the 24-Hour Rule, 24-Hour Lever and JIT initiatives.

**B.    Cardinal Manipulated its Accounting Policy for, and Failed to Disclose Its Use of, Cash Discounts to Inflate its Operating Earnings**

41.    Cardinal selectively paid vendor invoices early between FY 2001 and FY 2004. Cardinal did this in order to record cash discount income early, in quarters when Cardinal needed additional earnings to meet its earnings targets, rather than in the immediately following quarters when that income normally would have been recorded. This was known as the "cash discount buyout" initiative. Cardinal also referred to this practice as "buying out" cash discounts. Cardinal was able to use this initiative because, prior to changing its policy in the fourth quarter of FY 2004, Cardinal accounted for cash discounts as a reduction in the cost of sales immediately upon payment of vendor invoices. By recognizing the amount of the cash discount in cost of sales, Cardinal increased its reported gross margin and operating earnings for the quarters in which it bought out cash discounts (*i.e.* paid invoices early). Until September 2004,

Cardinal did not disclose its accounting policy for cash discounts or its use of cash discount buyouts to inflate operating income in certain periods. In its September 13, 2004 Form 8-K announcing the restatement, Cardinal disclosed its accounting policy for recognizing cash discounts and the Company's practice of accelerating payment of vendor invoices at the end of certain reporting periods in order to improve its operating results for those periods.

42.    In the ordinary course of business, Cardinal received cash discounts from suppliers for paying invoices within a certain time, typically 30 days from delivery of the product. Those discounts ordinarily were the same whether Cardinal paid on the first or last day of the discount period. As a result, there was no economic benefit to Cardinal to paying the invoice before the last day. Thus, Cardinal's typical practice was to pay the invoice as late as possible, in order to earn interest on its cash while still obtaining the full benefit of the cash discount.

43.    Cardinal closely monitored its financial performance, and thus knew when it was projecting that it would fail to meet analysts' expectations. In many of those situations, Cardinal identified invoices where the cash discount period extended over two different reporting periods. Cardinal then paid those invoices before the last day the discount was available, in the earlier reporting period, so that it could record the cash discount in the earlier period. The number of invoices paid early varied depending on the size of the earnings gap that needed to be closed to meet analysts' projections. Cardinal implemented cash discount buyouts by paying invoices early that otherwise would have been paid up to five days into the next quarter.

44.    The practice of cash discount buyouts generally occurred in Pharmaceutical Distribution, and members of Cardinal's corporate management made the decisions regarding whether to buy out cash discounts, and the number of days to be bought out. Cardinal frequently bought out cash discounts in consecutive quarters.

45.    Cardinal bought out cash discounts in the first, second, third and fourth quarters of FY 2001, resulting in the acceleration of cash discount income in the amounts of $4.26 million, $11.21 million, $9.02 million and $9.97 million, respectively.  Cardinal bought out cash discounts in FY 2002, resulting in the acceleration of cash discount income in the amounts of $1.85 million in the first quarter and $559,000 in the second quarter.  Cardinal considered cash discount buyouts as a possible method of boosting reported earnings even in quarters where cash discount buyouts were not used.

46.    Cardinal bought out cash discounts in the second, third and fourth quarters of FY 2003, resulting in the acceleration of cash discount income in the amounts of $2.77 million, $11.34 million and $14.14 million, respectively.  Cardinal also bought out cash discounts in the first, second, third and fourth quarters of FY 2004, resulting in the acceleration of cash discount income in the amounts of $13.83 million, $19.33 million, $18.15 million and $16.53 million, respectively.  Cardinal's use of cash discount buyouts to accelerate the recording of income and its failure to disclose this practice materially misstated the Company's reported net earnings throughout the relevant period.

**C.    Cardinal's Fraudulent and Improper Reserve Practices**

**1.    Manipulation of Reserves by Cardinal**

47.    On certain occasions in FY 2000 through FY 2004, Cardinal fraudulently manipulated certain balance sheet reserve accounts and other accrual accounts as another initiative to manage its earnings.  Cardinal also made other adjustments to certain reserve accounts that were not in accordance with GAAP.  During this period, Cardinal made at least 73 different period-end adjustments in 60 different reserve accounts, resulting in an overstatement of the Company's net earnings of approximately $65.2 million.  Reserve balances or excesses

were reported to Cardinal's corporate management on a quarterly basis. Corporate management then analyzed the reserve balances and sometimes directed business unit employees to use reserves as initiatives to help Cardinal meet its earnings goals. In virtually every quarter, Cardinal analyzed various reserve adjustments to show the effect those adjustments would have on Cardinal's EPS.

48.     As outlined in Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies, at paragraph 8, GAAP requires a reserve to be created, and a charge to income to be taken, if it is both probable that a liability has been incurred and the amount of the liability can be reasonably estimated. Conversely, to the extent a liability is no longer probable and reasonably estimable, a reserve should be removed from the books or decreased and income should be increased. In addition, paragraph 14 of SFAS No. 5 specifically prohibits the accrual of "reserves for general contingencies" or for "[g]eneral or unspecified business risks." Impact on reported earnings is not a proper factor to consider in determining whether to adjust a reserve.

49.     On various occasions, Cardinal adjusted reserves and other accruals – or delayed making adjustments – in order to meet its own internal earnings projections, earnings guidance, and analysts' expectations, without regard for whether the reserve adjustments were in accordance with GAAP. In addition, in many instances, Cardinal identified reserves as an "available item not used," indicating that the reserve should have been reversed at that time but was maintained and available to help Cardinal meet its earnings goals in a future quarter. This practice was not in accordance with GAAP. Also, in at least one instance, Cardinal improperly created and built up a general contingency reserve eventually totaling $2 million, in the absence of a specific liability that was reasonably estimable. Cardinal later adjusted this reserve as an

earnings initiative.  In a December 13, 2002 e-mail exchange, two members of Cardinal's

corporate management discussed reversing this $2 million reserve "to help make the quarter" and

noted that "[w]e built it for a rainy day…and it looks like it is pouring!"

50.     Cardinal had a material weakness in its internal controls with respect to reserves.

This material weakness caused errors or a lack of substantiation with respect to the amount of

certain reserves and the timing of the release of certain reserves and a lack of effective

communication relating to balance sheet reserves.  The material weakness in Cardinal's internal

controls also included a failure, in many instances, to document who authorized the reserve

adjustments.

### 2.     Overall Impact of Reserve Adjustments on Cardinal's Reported Earnings

51.     By fraudulently and improperly accounting for reserves in FY 2000 through

FY 2004, Cardinal overstated its net earnings by a cumulative total of approximately $65.2

million.  Cardinal manipulated or improperly used reserve and balance sheet adjustments in all

four of its segments, as well as at the Corporate level in FY 2000 through 2004, and in every

quarter of FYs 2002 and 2003.  As Cardinal disclosed in its FY 2004 restatement, the impact of

these practices was a $14.5 million understatement of FY 2002 reported net earnings, a $30.7

million overstatement of FY 2003 reported net earnings, and a $15.4 million overstatement of

FY 2004 reported net earnings, as well as a $33.6 million cumulative overstatement of reported

net earnings in periods prior to FY 2002.

52.     On a quarterly basis, as a result of its fraudulent and improper use of reserve

accounts, Cardinal overstated its reported EPS for the first two quarters of FY 2002 by $.01 each,

for the first quarter of FY 2003 by $.02, for the third quarter of FY 2003 by $.03, for the fourth

quarter of FY 03 by $.02, and for the first three quarters of FY 2004 by $.01 each.  Had it not

engaged in these practices, Cardinal would have missed analysts' EPS consensus estimates for the first quarter of FY 2002 by $.01, for the first quarter of FY 2003 by $.01, for the third quarter of FY 2003 by $.03, for the fourth quarter of FY 2003 by $.02, for the first quarter of FY 2004 by $.02, and for the second and third quarters of FY 2004 by $.01 each.  Additionally, Cardinal would have missed its commitment to 20% or higher EPS growth for the first and second quarters of FY 2002, the third and fourth quarters of FY 2003 and the full FY 2003.  The annual impact of Cardinal's reserves practices peaked in FY 2003, during which Cardinal overstated its reported EPS for the year by $.06 due to improper reserve adjustments, without which the Company would have missed analysts' EPS consensus estimates for the year by that amount and would have missed the Company's commitment to 20% or higher EPS growth for the year by 1.44%.

53.    Cardinal's use of reserve adjustments caused the Company's reported operating earnings to be materially misstated in earnings releases and periodic filings with the Commission for 15 consecutive quarters, from the first quarter of FY 2001 though the third quarter of FY 2004.

**D.    Cardinal Improperly Classified Estimated Vitamin Litigation Recoveries**

54.    Cardinal, through RP Scherer, a Pharmaceutical Technologies segment subsidiary, was a plaintiff in a 1999 class action to recover overcharges from vitamin manufacturers that pleaded guilty to fixing prices from 1988 to 1998.  In March 2000, the defendants in that action reached a provisional settlement with the plaintiff class, under which Cardinal could have received approximately $22 million.  Cardinal, among other plaintiffs, opted out of the settlement and filed a separate lawsuit in federal district court in May 2000.

1.    **Cardinal Improperly Classified**
**$10 Million of Estimated Vitamin Litigation**
**Recoveries During the Second Quarter of FY 2001**

55.    In October 2000, members of Cardinal's corporate management

began considering recording a portion of the expected vitamin settlement, a contingent litigation

gain, for the purpose of closing a gap to Cardinal's budgeted earnings for the second quarter of

FY 2001, which ended December 31, 2000. In one November 2000 e-mail, a member of

Cardinal's corporate management explained why Cardinal sought to use the vitamin gain, rather

than other earnings initiatives, to close the gap to budget for the second quarter of FY 2001,

noting "[w]e do not need much to get over the hump, although the preference would be the

vitamin case so that we do not steal from Q3."

56.    Effective December 31, 2000, the last day of the second quarter of FY 2001,

Cardinal recorded the $10 million contingent vitamin litigation gain as a reduction to cost of

sales for the second quarter of FY 2001. Cardinal's classification of the $10 million as a

reduction to cost of sales was not in accordance with GAAP. Without recording and classifying

the $10 million vitamin gain as a reduction to cost of sales, Cardinal would have missed

analysts' average consensus EPS estimate for the quarter by $.02, would have missed the low

end of analysts' end-of-period EPS estimate range by $.01 and would have missed its

commitment to 20% or higher EPS growth from the year-ago quarter.

57.    During the remainder of FY 2001, Cardinal continued to consider recording

additional estimated vitamin recoveries. Cardinal discussed with its auditor at the time (the

"First Auditor") whether it could record an additional amount. However, the First Auditor did

not believe that circumstances justified recording an additional amount. The First Auditor also

warned Cardinal that it was concerned about the appearance of earnings management. Cardinal

21

did not record additional estimated vitamin recoveries in the third or fourth quarters of FY 2001. In addition, at this time, the First Auditor advised Cardinal that the $10 million Cardinal had recognized in the second quarter of FY 2001 as a reduction to cost of sales should be reclassified "below the line" as other non-operating income and disclosed. Had Cardinal originally recorded the $10 million gain in this way, it would have had no impact on Cardinal's operating earnings. Cardinal, however, did not reclassify the $10 million during the remainder of FY 2001.

> **2.    Cardinal Improperly Classified**
> **$12 Million of Estimated Vitamin Litigation**
> **Recoveries During the First Quarter of FY 2002**

58.    Cardinal's corporate management considered recording an additional gain from the vitamin litigation during the first quarter of FY 2002, which ended September 30, 2001. As the quarter progressed, shortfalls to forecasted earnings further prompted members of Cardinal's corporate management to discuss the need to record additional vitamin income. By the end of the quarter, Cardinal's corporate management concluded that the only way to bridge Pharmaceutical Technologies' earnings shortfall was to record an additional vitamin gain.

59.    Effective September 30, 2001, the last day of the first quarter of FY 2002, Cardinal recorded the $12 million gain within operating income for the first quarter of FY 2002. Cardinal classified the gain as a reduction to cost of sales, in order to boost Cardinal's operating earnings. Without recording and classifying the $12 million as it did, Cardinal would have missed analysts' average consensus EPS estimate for the quarter by $.02, would have missed the low end of analysts' end-of-period EPS estimate range by $.01 and would have missed its commitment to 20% or higher EPS growth from the year-ago quarter.

60.    The First Auditor disagreed with Cardinal's classification of the $12 million

as a reduction to cost of sales. The First Auditor advised Cardinal that the amount should have been recorded outside of operating income, as other non-operating income, and should be disclosed. The First Auditor advised Cardinal that, because the estimated vitamin recovery arose from litigation, was non-recurring, and stemmed from claims against third parties that originated nearly 13 years earlier, it was not appropriate to classify the gain as a reduction to cost of sales. The First Auditor noted its disagreement with Cardinal's classification and informed corporate management that the Company should reclassify both the $10 million and the $12 million in vitamin litigation gains prior to Cardinal's earnings release for the September 2001 quarter.

61.    Like the previously recorded $10 million, Cardinal's classification of the $12 million contingent vitamin litigation gain as a reduction to cost of sales was not in accordance with GAAP.

62.    In May 2002, in connection with the cessation of business of the First Auditor, Cardinal engaged a new auditor (the "Second Auditor"). The Second Auditor was responsible for auditing Cardinal's financial statements for the full FY 2002, ended June 30, 2002, and thus, it reviewed Cardinal's classification of the $12 million vitamin gain as a reduction to cost of sales.

63.    The Second Auditor agreed with the First Auditor that Cardinal should not have recorded the expected vitamin settlement proceeds as a reduction to cost of sales. The Second Auditor concluded that the $12 million should be reclassified in a way that would not have improved Cardinal's operating earnings before special items.

64.    In June 2002, Cardinal informed the Second Auditor that the Company did not

believe that the $12 or $10 million gains should be reclassified. The Second Auditor advised the

Company that it disagreed with this conclusion but would treat the $12 million as a "passed

adjustment" and include the issue in its summary of audit differences.

65.    In its Form 10-K for FY 2004, Cardinal restated its financial results to reverse

the $10 million estimated vitamin recovery recorded during the quarter ended December 31,

2000, as well as the $12 million recorded during the quarter ended September 30, 2001. As

restated, Cardinal reduced its net earnings for each of these quarters by the amounts previously

recorded, net of tax, and recognized the amounts, net of tax, as a special item in the quarter

ended June 30, 2002, the period in which the cash was received. Cardinal received its first cash

settlement in the fourth quarter of FY 2002 and thereafter received a total of over $135 million in

vitamin litigation settlement proceeds.

> **3.    Cardinal Issued Earnings Releases and
> Filed Reports with the Commission that were
> Materially False and Misleading Due to its Improper
> Treatment of the Contingent Vitamin Litigation Gain**

> **a.    The FY 2001 $10 Million Contingent Vitamin Litigation Gain**

66.    Cardinal made materially false and misleading statements in its January 30, 2001

earnings release for the second quarter of FY 2001, as well as in its Form 10-Q for the same

period, because Cardinal overstated its operating earnings by classifying the $10 million

contingent vitamin litigation gain recorded during this quarter as a reduction to cost of sales,

which was not in accordance with GAAP. Further, Cardinal failed to disclose that it had

recorded any amount of vitamin litigation gain during the quarter. This omission was material,

because investors and analysts had no way of knowing that Cardinal recorded the $10 million

vitamin litigation gain as a reduction to cost of sales and, consequently, that this non-recurring

item had impacted operating income. Because this item was not properly classified or disclosed,

investors and analysts were unaware that, without recording the $10 million in operating income, Cardinal would have missed analysts' average consensus estimate for the quarter by $.02, missed the low end of analysts' end-of-period EPS estimate range by $.01 and missed Cardinal's commitment to 20% or higher EPS growth from the year-ago quarter.

67.    Cardinal made additional materially false and misleading statements about the performance of Pharmaceutical Technologies. Cardinal reported operating earnings of $59 million and operating earnings growth of 15% in Pharmaceutical Technologies, as compared to the year-ago quarter, and attributed Pharmaceutical Technologies' operating earnings growth to higher-margin revenues and productivity improvements. These statements were materially false and misleading because Cardinal failed to disclose that Pharmaceutical Technologies' reported earnings and earnings growth had been inflated by the misclassification of a $10 million non-recurring item, which represented 17% of Pharmaceutical Technologies' reported operating earnings. Without the undisclosed and non-recurring $10 million gain, the Pharmaceutical Technologies segment's operating earnings would actually have decreased 4.7%, as compared to the year-ago quarter, rather than the 15% operating earnings increase Cardinal reported for Pharmaceutical Technologies. Similarly, without the benefit from the non-recurring $10 million vitamin gain, Pharmaceutical Technologies' operating gross margin as a percentage of operating revenue would not have increased, as compared to the year-ago quarter, as the Company claimed, but, instead, would have actually decreased.

**b.    The FY 2002 $12 Million Contingent Vitamin Litigation Gain**

68.    Cardinal made materially false and misleading statements in its October 23, 2001 earnings release for the first quarter of FY 2002 because Cardinal overstated its operating earnings by classifying the $12 million contingent vitamin litigation gain recorded during this

quarter as a reduction to cost of sales, which was not in accordance with GAAP.  Cardinal also failed to disclose that it had recorded any amount of vitamin litigation gain during the quarter. Because this item was not properly classified or disclosed, investors and analysts were unaware that, without recording the $12 million in operating income, Cardinal would have missed analysts' average consensus estimate for the quarter by $.02, missed the low end of analysts' end-of-period EPS estimate range by $.01 for the quarter and missed Cardinal's commitment to 20% or higher EPS growth from the year-ago quarter.

69.    Cardinal made additional materially false and misleading statements about the performance of Pharmaceutical Technologies.  In its October 23, 2001 earnings release, Cardinal reported operating earnings of $58 million and operating earnings growth in Pharmaceutical Technologies, as compared to the year-ago quarter, and attributed Pharmaceutical Technologies' operating earnings growth to strong revenue and improving gross margin performances.  These statements were materially false and misleading because Cardinal failed to disclose that Pharmaceutical Technologies' reported operating earnings, earnings growth and operating gross margin for the quarter were materially impacted by the misclassification of a $12 million non-recurring item, which represented 21% of Pharmaceutical Technologies' reported operating earnings.  Without this undisclosed and non-recurring $12 million gain, Pharmaceutical Technologies' operating earnings would actually have decreased 8.4% as compared to the year-ago quarter.

70.    Cardinal's Form 10-Q for the first quarter of FY 2002, which Cardinal filed with the Commission on November 14, 2001, overstated the Company's operating earnings by $12 million because the Company had fraudulently classified the vitamin litigation gain recorded during this quarter as a reduction to cost of sales.  Although Cardinal disclosed that

certain declines in Pharmaceutical Technologies' business "were largely offset by the recording of the minimum recovery expected to be received for claims against vitamin manufacturers for amounts overbilled in prior years" and that "[t]his pricing adjustment was recorded as a reduction of cost of goods sold, consistent with the original overcharge," Cardinal did not disclose the amount of the "recovery" it had recorded. This omission was material because analysts and investors were unaware that, absent recording this amount, Cardinal would have missed analysts' average consensus estimate for the quarter by $.02, missed the low end of analysts' end-of-period EPS estimate range by $.01 and missed Cardinal's commitment to 20% or higher EPS growth from the year-ago quarter. Cardinal repeated this materially false and misleading omission in its Forms 10-Q for the quarters ended December 31, 2001, and March 31, 2002.

71.    Cardinal's disclosure that it was recording "the minimum recovery expected to be received" for the vitamin claims was materially false and misleading. This disclosure misled investors and analysts to believe that this was the first time that Cardinal had recorded a gain in connection with amounts overbilled by vitamin manufacturers. In fact, unbeknownst to investors and analysts, Cardinal had previously recorded a $10 million vitamin litigation gain as a reduction to cost of sales during the quarter ended December 31, 2000. Cardinal's disclosure that it had recorded the pricing adjustment as a reduction to cost of sales "consistent with the original overcharge" also was materially false and misleading because Cardinal had actually recorded the pricing adjustment as a reduction to cost of sales in order to inflate its quarterly operating earnings and EPS. Cardinal repeated these materially false and misleading statements and omissions in its Forms 10-Q for the quarters ended December 31, 2001, and March 31, 2002.

72.    Cardinal also made materially false and misleading statements in its Form

10-Q for the quarter ended September 30, 2001 about Pharmaceutical Technologies'
performance. Cardinal reported that Pharmaceutical Technologies' operating gross margin as a
percentage of operating revenue increased, as compared to the year-ago quarter. However,
Cardinal failed to disclose the amount of non-recurring vitamin gain by which Pharmaceutical
Technologies' operating gross margin benefited. This omission was materially false and
misleading because, without recording the $12 million vitamin gain, Pharmaceutical
Technologies' operating gross margin would have actually decreased, as compared to the year-
ago quarter.

**E.    Cardinal's LIFO Manipulation and Disclosure Failures**

73.    LIFO is an inventory valuation method whereby a company values the cost of the
product it sells at the price paid for its most recently purchased inventory. First-in-First-Out
("FIFO") is an inventory valuation method whereby a company values the cost of the product it
sells at the price paid for its oldest purchased inventory.

74.    At all relevant times, Cardinal applied the LIFO method to most of its
pharmaceutical inventory, including most inventory within the Pharmaceutical Distribution
segment. However, Cardinal applied FIFO to inventory within the Brokerage unit of
Pharmaceutical Distribution.

**1.    Cardinal Used LIFO to Manage Earnings**

75.    In June of 2003, Cardinal managed its FY 2003 earnings by manipulating its
LIFO inventory. Specifically, Cardinal used its Brokerage business, which applied FIFO, to
purchase $60 million of inventory for a business unit in Pharmaceutical Distribution that applied
LIFO. Cardinal deliberately held the inventory at the Brokerage business until after June 30,
2003, the end of FY 2003, so that the inventory would be accounted for under FIFO. In July

2003, Cardinal transferred the inventory from Brokerage back to the business unit of

Pharmaceutical Distribution that applied LIFO. By taking these actions, Cardinal avoided a

LIFO expense of $5.3 million in FY 2003, thereby overstating its FY 2003 reported operating

earnings by that amount and overstating its EPS for the fourth quarter of FY 2003 by $.01.

Absent manipulating its LIFO inventory, Cardinal would have missed analysts' EPS consensus

estimate for the quarter by $.01 and would have missed its commitment to 20% or higher EPS

growth from the year-ago quarter. In addition, because Cardinal purchased inventory through

Brokerage which should have been accounted for under LIFO, and accounted for the inventory

under FIFO during FY 2003, Cardinal's accounting treatment of the $60 million of inventory

was not in accordance with GAAP.

> **2.      Cardinal Failed to Disclose its Change in LIFO Accounting Method**

76.      The two basic methods for computing LIFO inventory valuation are "dollar

value" and "specific identification." Under the dollar value method, inventory quantities are

measured in terms of fixed dollar equivalents (indexed to a base year) for pools of items (*i.e.*

items similar in type or use). The specific identification method measures units on an item-by-

item basis, with each item having its own separate LIFO calculation.

77.      In June 2002, Cardinal switched from the specific identification method to the

dollar value method for generic pharmaceutical products. Cardinal's branded products remained

on the specific identification method. Cardinal failed to disclose this change in its Form 10-K

for FY 2002, and did not disclose the change until it filed its Form 10-K for FY 2005.

78.      The impact of the undisclosed FY 2002 change in LIFO accounting

method was a $23.1 million increase in Cardinal's reported operating earnings for FY 2002 and

an EPS increase of $.03 for the quarter ended June 30, 2002, and for the full FY 2002. Without

the impact of the change, Cardinal's reported EPS for the quarter ended June 30, 2002, would have missed analysts' average consensus estimate by $.02 and would have missed the low end of analysts' consensus range by $.01. Cardinal should have disclosed this change in accounting method because its impact was material. Cardinal, however, improperly concluded that the impact of this change was immaterial and did not disclose the change or its impact on reported earnings and EPS.

79.     Cardinal's failure to disclose the FY 2002 LIFO change in accounting principle and its impact was not in accordance with GAAP.

> **3.     Cardinal Issued Materially False and
> Misleading Earnings Releases and Periodic Reports
> Due to its LIFO Manipulation and Disclosure Failures**

80.     Cardinal's Form 10-K for FY 2003 was materially false and misleading because Cardinal's manipulation of its LIFO inventory materially overstated its operating earnings for FY 2003 by $5.3 million and materially overstated its EPS for the fourth quarter of FY 2003 by $.01, without which Cardinal would have missed analysts' average consensus estimate. For the same reasons, Cardinal's earnings release for the quarter and fiscal year ended June 30, 2003 also was materially false and misleading.

81.     Cardinal's Form 10-K for FY 2002 was materially false and misleading because Cardinal did not, as required by GAAP, disclose that it had effected a material change in LIFO accounting method and did not disclose the material impact of that change on Cardinal's operating earnings and EPS. For the same reasons, Cardinal's earnings release for the quarter and fiscal year ended June 30, 2002 also was materially false and misleading.

**F.    Cardinal's Improper Accounting and Premature Recognition of Pyxis Revenue**

82.    From FY 2002 through FY 2004, Pyxis, a business segment of Cardinal that primarily sells automated pharmacy equipment, engaged in fraudulent practices to prematurely recognize revenue.  A key component of Pyxis's business involved leasing and installing automated equipment that delivers drugs to patients at hospitals.  Prior to FY 2002, Pyxis had recognized revenue on such leases when the machines were "delivered" to the customer.  In FY 2002, Pyxis changed its accounting policy to recognizing revenue when the equipment was "installed."  Almost immediately, certain Pyxis employees began to manipulate this policy by soliciting "early acceptances" from customers, particularly at the end of quarters or fiscal years.  These early acceptances falsely certified that the equipment had been installed, so that Pyxis could recognize revenue.  Certain Pyxis employees sometimes offered inducements, such as deferred billing, to customers to obtain premature sign-off.  The conduct took place from FY 2002 through at least the end of FY 2004, occurred in every one of Pyxis's geographical sales regions and resulted in over 60 violations of Cardinal's revenue recognition policy.  The practice occurred, in part, because Cardinal did not have adequate internal controls in place to ensure that equipment installations were complete before the equipment confirmations were executed.

83.    In its restatement, Cardinal recorded an $8.3 million reduction of revenue and a $5.3 million reduction of operating earnings for the fourth quarter of FY 2004 to adjust for premature revenue recognition it determined had occurred within Pyxis during that quarter.  For FY 2002 and all previously reported quarters of FY 2003 and FY 2004, based on certain assumptions, Cardinal disclosed the estimated potential impact to revenue and operating earnings of its premature recognition of revenue during those periods.

### III.    CARDINAL INCORPORATED MATERIALLY FALSE
### AND MISLEADING PERIODIC REPORTS IN SECURITIES
### REGISTRATION STATEMENTS FILED WITH THE COMMISSION

84.    During the relevant time, Cardinal filed at least 10 registration statements with the Commission in which one or more materially false and misleading periodic reports were incorporated by reference.  The reports, among other things, materially overstated Cardinal's operating revenue, operating earnings, net income, EPS, operating gross margins and earnings and revenue growth trends.

85.    The registration statements incorporating the materially false and misleading periodic reports included filings Cardinal made to register stock used to acquire other companies and in certain business combinations.  The registration statements also included three shelf registrations, through which Cardinal offered the sale of a combination of common shares and debt securities, and two prospectus supplements under which Cardinal offered the sale of debt securities.  Finally, the registration statements also included filings Cardinal made to register stock to be used in stock option or incentive plans for employees of companies it acquired.

### CLAIMS FOR RELIEF

### FIRST CLAIM

### Cardinal Violated Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Fraud in Connection with the Purchase or Sale of Securities)

86.    Paragraphs 1 through 85 above are realleged and incorporated herein by reference.

87.    Cardinal, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly, in connection with the purchase or sale of securities:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of a material fact or omitted to state a

material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any person.

88.     In connection with the above described fraudulent acts and omissions, Cardinal acted knowingly or recklessly.  Further, Cardinal knew, or was reckless in not knowing, that the Company's annual and periodic reports and other public disclosures were materially false and misleading.

89.     By reason of the foregoing, Cardinal violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Cardinal Violated Section 17(a) of the Securities Act of 1933
### (Fraud in the Offer or Sale of Securities)

90.     Paragraphs 1 through 89 above are realleged and incorporated herein by reference.

91.     Cardinal, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

92.     In connection with the above described acts and omissions, Cardinal acted knowingly or recklessly.  Further, Cardinal knew, or was reckless in not knowing, that certain registration statements it filed with the Commission were materially false and misleading.

93.    By reason of the foregoing, Cardinal violated Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)].

### THIRD CLAIM

**Cardinal Violated Section 13(a) of the Exchange Act**
**and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13**
**(Reporting Violations)**

94.    Paragraphs 1 through 93 above are realleged and incorporated herein by reference.

95.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.13a-1, 240.13a-11 and 240.13a-13] require issuers of registered securities to file with the Commission factually accurate annual, quarterly and current reports. Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

96.    As described above, Cardinal filed with the Commission annual and quarterly reports, from the first quarter of its FY 2001 through the third quarter of its FY 2004, that were materially false and misleading or failed to include material information necessary to make the required statements in those reports, in light of the circumstances under which they were made, not misleading. During this period, Cardinal also furnished to the Commission, as part of required current reports on Form 8-K, at least five earnings releases that were materially false and misleading or failed to include material information necessary to make the required statements in those reports, in light of the circumstances under which they were made, not misleading.

97.     By reason of the foregoing, Cardinal violated Section 13(a) of the Exchange

Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R.

§§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

## FOURTH CLAIM

### Cardinal Violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act (Books and Records and Internal Control Violations)

98.     Paragraphs 1 through 97 above are realleged and incorporated herein by

reference.

99.     Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]

requires public companies to make and keep books, records and accounts which, in reasonable

detail, accurately and fairly reflect the company's transactions and dispositions of its assets.

Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires public companies,

among other things, to devise and maintain a system of internal accounting controls sufficient to

provide reasonable assurances that the company's transactions were recorded as necessary to

permit preparation of financial statements conforming with GAAP.

100.     By reason of the foregoing, Cardinal violated Sections 13(b)(2)(A) and

13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, The Commission respectfully requests that this Court enter a final judgment which:

### I.

Permanently restrains and enjoins Cardinal from further violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13];

### II.

Orders Cardinal to disgorge certain gains, together with prejudgment interest thereon;

### III.

Orders Cardinal to pay a civil penalty for its unlawful acts pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### IV.

Orders Cardinal to retain an independent consultant to review and make recommendations concerning its policies, procedures and controls related to the allegations in this Complaint;

### V.

Retains jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered, or to entertain any suitable application or motion for additional

relief within the jurisdiction of the Court; and

**VI.**

Grants such other and further relief as this Court may deem necessary and appropriate

under the circumstances.

Dated:  July 26, 2007

Respectfully submitted,

Arthur S. Lowry (AL 9541)
Antonia Chion
Christopher R. Conte
Daniel Chaudoin
Jeffrey P. Weiss
Joseph Griffin
Angela L. Sierra

Attorneys for Plaintiff
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
(202) 551-4918 (Lowry telephone)
(202) 772-9245 (Lowry facsimile)